In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 17-1651

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID WATSON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division
No. 2:15CR79-001 — **Rudy Lozano**, *Judge*.

———————————

ARGUED APRIL 25, 2018 — DECIDED AUGUST 17, 2018

———————————

Before MANION, HAMILTON, and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. The police received an anonymous
911 call from a 14-year-old who borrowed a stranger's phone
and reported seeing "boys" "playing with guns" by a "gray
and greenish Charger" in a nearby parking lot. A police of-
ficer then drove to the lot and blocked a car matching the
caller's description. The police found that a passenger in the
car, David Watson, had a gun. He later conditionally pleaded
guilty to possessing a firearm as a felon, 18 U.S.C. § 922(g)(1),

but preserved for appeal his argument that the court should have suppressed the gun because the stop lacked reasonable suspicion.

We agree with Watson that the police did not have reasonable suspicion to block the car. The anonymous tip did not justify an immediate stop because the caller's report was not sufficiently reliable. The caller used a borrowed phone, which would make it difficult to find him, and his sighting of guns did not describe a likely emergency or crime—he reported gun possession, which is lawful. We therefore vacate the judgment and remand for further proceedings.

I.

Around 9:30 a.m. on Sunday, July 5, 2015, an unidentified caller in Gary, Indiana, phoned 911 to report that "boys" were "playing with guns and stuff" in a parking lot at an address that the caller specified. He explained that the boys "were standing there" by a "gray and greenish Charger" and "just out there playing with they guns." The caller said that he was 14 years old and was calling from a McDonald's across the street. The 911 operator elicited a few more details: the "boys" were black, were in a group of four to five, and had two guns. The caller added that he was calling from a phone that he had just borrowed from "this man" and that he would "try to stay close" to it.

The 911 operator radioed this information to Officer Anthony Boleware of the Gary Police Department: "Have a man with a gun 1532 West Fifth Avenue. 1-5-3-2 West Fifth Avenue. Have five male blacks in the parking lot across from McDonald's in a green—check that, a gray and green Charger displaying weapons. 1-5-3-2 West Fifth Avenue [inaudible]."

Boleware testified at the suppression hearing that after hearing the dispatch, he identified the address as "a heavy area for crime" where the police were frequently called. He thought that this particular call was urgent because "[i]f it was described like three or four guys displaying weapons, they might [be] about to shoot somebody." Officer Wayne Dodson, another officer who responded to the call, also testified that he knew that address to be "a hot area" and considered the call urgent because "[a]ny time you have males with weapons, there's always a sense of urgency 'cause anything could happen."

Boleware drove to the address and saw in the parking lot "a Charger with about four guys sitting in it." Using his patrol car, he blocked the Charger before approaching it on foot. All of the occupants denied having any weapons in the car. Within nine minutes, three other officers arrived in response to Boleware's request for backup, and each officer blocked a car door. At that point, Boleware told the other officers to take each occupant out of the car and frisk him for weapons. When another officer ordered Watson, the front seat passenger, out of the car, Watson threw a gun onto the backseat floor. Boleware grabbed the gun and noticed another gun inside the pouch in front of the backseat passenger.

Watson was charged with possessing a firearm as a felon, *see* 18 U.S.C. § 922(g)(1). He moved to suppress the two firearms recovered from the car. At a hearing, Boleware and Dodson testified as recounted above, and the court received the recording and transcript of the 911 call, the recording of the dispatch, and the surveillance video of the parking lot.

Watson argued that Boleware unlawfully seized him by blocking the Charger without reasonable suspicion that a

crime had occurred or was imminent. The 911 caller, Watson said, reported only gun possession, which is lawful in Indiana, and did not establish the reliability of his anonymous tip. The government countered that under *Navarette v. California*, 134 S. Ct. 1683 (2014), the anonymous tip was reliable and established reasonable suspicion of a crime because the caller reported his own contemporaneous observations about persons playing with guns in a high-crime area. And the government contended that the collective-knowledge doctrine permitted the court to rely on facts that the dispatcher knew but did not convey to Boleware to support reasonable suspicion.

The district court concluded that the seizure was lawful and denied Watson's motion to suppress. The court reasoned that the anonymous caller, like the tipster in *Navarette*, reported activity that he witnessed contemporaneously and provided enough detail to supply reasonable suspicion of a crime. In addition, the court agreed with the government that the collective-knowledge doctrine applied.[1] Following this ruling, Watson pleaded guilty to unlawfully possessing the gun but reserved the right to appeal the denial of his suppression motion. He was sentenced to 30 months in prison and 2 years of supervised release.

---

[1] The collective-knowledge doctrine permits an officer to "stop … a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). Because Watson does not challenge on appeal the district court's reliance on the doctrine, we do not address whether the district court applied it correctly here.

II.

Under the Fourth Amendment, an officer cannot stop someone to investigate potential wrongdoing without reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion turns on "the totality of the circumstances" and whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette*, 134 S. Ct. at 1687 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The government bears the burden of establishing reasonable suspicion, *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013), and we review the reasonableness of a stop de novo. *United States v. Miranda-Sotolongo*, 827 F.3d 663, 666 (7th Cir. 2016).

Because anonymous tips relayed to a police officer "seldom demonstrate[] the informant's basis of knowledge or veracity," they alone usually are not reliable enough to establish reasonable suspicion. *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). But the Supreme Court, in its most recent anonymous-tip case (which it called a "close case"), identified three factors that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing. *Navarette*, 134 S. Ct. at 1689–90. In that case, the Court ruled that an anonymous caller's 911 report that a specified truck had just run her off the road gave the responding officer reason to stop the truck and its driver on suspicion of drunk driving. *Id.* at 1689–92.

The government argues that *Navarette* controls because its three factors are present here, thereby making the tip about "boys" "playing with guns" sufficiently reliable. The anonymous caller claimed to have personally observed two guns; he reported the event when he was just across the street from the guns; and he made the report via 911, which allowed the call to be traced. Several factors, however, distinguish this case from *Navarette*.

First and most significantly, *Navarette*'s rationale for deeming 911 calls reliable has much less force here. The Supreme Court concluded that 911 calls are more dependable because their features "provide some safeguards against making false reports with immunity." *Navarette*, 134 S. Ct. at 1689. Specifically, the calls are recorded, so a victim of a false report may be able to identify the anonymous caller's voice later, and the calls can be traced back to a particular phone number and geographic location. *Id.* at 1690. But here, the caller borrowed a stranger's phone, limiting the usefulness of the system's tracing ability. Any phone number identified would not lead back to the caller because he had no permanent connection to the phone, and the phone's geographic location at the time of the call would be useful only so long as the caller remained near the phone. Under these circumstances, it is not obvious that the young caller would be worried about getting caught providing false information and therefore "think twice" before doing it. *Id.*

The second distinction is that the tip in *Navarette* reported conduct that the officers reasonably suspected to be criminal. There, the caller reported being run off the road by a truck, which "created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of

past recklessness." 134 S. Ct. at 1690–91. In contrast, the caller's report in this case about the presence of guns did not create a reasonable suspicion of an ongoing crime, because carrying a firearm in public is permitted with a license in Indiana. *See* IND. CODE § 35-47-2-1(a). To be sure, the presence or use of guns is not always legal. The caller's reference to "boys" might have meant minors, who generally cannot legally possess firearms in Indiana. *See* IND. CODE § 35-47-10-5(a). And "playing with guns" might mean using them illegally or dangerously, including by pointing a gun at another or engaging in "tumultuous conduct" (conduct "likely to result in[] serious bodily injury to a person or substantial damage to property," IND. CODE § 35-45-1-1). *See* IND. CODE §§ 35-45-1-3(a), 35-47-4-3(b). Finally, those seen with guns might not have had the required gun licenses.

But "a mere possibility of unlawful use" of a gun is not sufficient to establish reasonable suspicion. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014–15 (7th Cir. 2016). It must instead be "sufficiently probable that the observed conduct suggests unlawful activity." *Miranda-Sotolongo*, 827 F.3d at 669. And the connection to unlawful activity is just too speculative here. "Boys" could be a generic term for men of any age, and "playing with guns" could mean displaying them, which is not criminal conduct. Lacking detail, the report of guns in public does not suggest likely criminal activity.

Finally, unlike in *Navarette*, the police here were not called to resolve an emergency situation. The anonymous caller in *Navarette* reported activity that put others at imminent risk: she said that the truck driver had continued down the highway after he ran her off the road. 134 S. Ct. at 1689. The stop

was lawful because "allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences." *Id.* at 1691–92.

The circumstances in this case, however, did not necessitate an emergency response. The anonymous caller reported no tense situation, like a verbal argument or physical confrontation, that suggested violence would erupt. Moreover, although he dialed 911, he never asked for or hinted that a quick response was needed to prevent imminent harm to others. Reports of emergencies have a "special reliability," requiring "a lower level of corroboration." *United States v. Hicks*, 531 F.3d 555, 559–61 (7th Cir. 2008) (concluding that tip was sufficiently reliable where caller reported "armed black-clothed black man was involved in an ongoing domestic disturbance"); *see also United States v. Williams*, 731 F.3d 678, 684 (7th Cir. 2013) (determining that emergency justified stop where "large group of people [were] being loud and waving guns" in known violent-crime area). This call lacked that "special reliability."

But even if the caller's use of 911 and report of "boys" "playing with guns" made the officers worry about an emergency, that worry should have dissipated when Officer Boleware arrived at the scene. What he saw did not match the caller's report: no one was playing with guns in the parking lot. Instead, men were seated inside the identified car with no guns in sight. If there had been a potential emergency at the time of the call, it no longer existed when the police arrived.

These three factors make *Navarette* distinguishable, but for completeness we reject a fourth distinction that Watson proposes: that we should treat an anonymous report from a child

as less reliable. Watson argues that, just as the law treats children differently than adults in other areas, we should treat a child's tip with considerable skepticism. *See Hardaway v. Young*, 302 F.3d 757, 763–64 (7th Cir. 2002) (reviewing distinctions between adults and minors under the law). But a caller's age alone should not be reason to disregard his tip where, as here, he responded appropriately to the operator's questions, described the events in some detail, presented an internally consistent report, and remained available.

Putting *Navarette* to the side, the government contends that the tip reliably conveyed likely criminal activity because the caller reported guns in what the officers considered a high-crime area. This argument is unpersuasive. People who live in rough neighborhoods may want and, in many situations, may carry guns for protection. They should not be subject to more intrusive police practices than are those from wealthy neighborhoods. *See Williams*, 731 F.3d at 694 (Hamilton, J., concurring).

Watson persuasively argues that this case is controlled by *J.L.* and distinguishable from *Williams*, our most analogous case, both decided before *Navarette*. In *J.L.*, the Supreme Court also dealt with a tip about a gun. *See* 529 U.S. at 268. An anonymous tipster had reported "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* But the tipster did not use the 911 system, he did not reveal how he knew that the man was armed, and the tip itself did not predict future behavior. *Id.* at 271. In ruling that this tip was not sufficiently reliable, the Court rejected two arguments that are relevant here. First, *Terry* did not permit a "firearm exception" to the reliability requirement. *Id.* at 272–273.

Such an exception "would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." *Id.* at 272. Second, the tip must be reliable even if it is about a minor carrying a gun. *See id.* at 273 n.*.

In *Williams*, the anonymous 911 caller reported that a group of 25 people was "being loud while loitering" in a bar's parking lot and that three or four group members had "guns out." 731 F.3d at 681. Arriving at most 5 minutes after the call, police found 8 to 10 persons remaining in the bar's parking lot, and they were neither speaking loudly nor displaying guns. *Id.* As the group began slowly dispersing, the officers stopped and patted down some of the group members. *Id.* We concluded that while it was a "very close call," the "emergency report" gave the police reasonable suspicion to stop the persons they saw in the bar's parking lot when they arrived. *Id.* at 684.

The circumstances here are similar enough to *J.L.*—and sufficiently distinguishable from the "very close call" in *Williams*—for us to rule that this tip was not reliable. Although the caller used the 911 system and explained that he himself saw "boys" with guns, the report at its core was one of firearm possession, just as in *J.L.*, which is not criminal. In *Williams*, by contrast, the caller described something more than mere possession—25 rowdy people outside a bar at night, some of whom were waving guns. This reasonably suggested a volatile situation requiring a quick response. The small group here, however, was standing outside an apartment building on a Sunday morning—a situation that does not convey the same sense of volatility.

We close by noting that the police were right to respond to the anonymous call by coming to the parking lot to determine what was happening. But determining what was happening and immediately seizing people upon arrival are two different things, and the latter was premature. We recognize that the calculus is complicated when police respond to tips involving firearms, at least in areas where carrying a firearm in public is not itself a crime. On the one hand, police are understandably worried about the possibility of violence and want to take quick action; on the other hand, citizens should be able to exercise the constitutional right to carry a gun without having the police stop them when they do so.

For those cases like this one in which the tip does not establish reasonable suspicion of a crime, the police have options other than an instant *Terry* stop. It would, for example, be "appropriate to respond to the 911 call with a strong and visible police presence, one that involved talking with people on the scene when they arrived." As long as communication with the police remained voluntary, there would be no Fourth Amendment stop. *Williams*, 731 F.3d at 693 (Hamilton, J., concurring). Alternatively, the police could arrive on the scene and make their own observations about the developing situation, which could transform an innocuous tip into reasonable suspicion to seize an individual. *See, e.g., White*, 496 U.S. at 331–32 (concluding that police corroboration of anonymous tip through surveillance justified *Terry* stop). And if the subjects of the call are in a car as they were here, the police can stop the car, even if they do so because they want to investigate the report further, as long as they have probable cause to believe that a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810–13 (1996).

\* \* \*

Like *Navarette*, Watson's case presents a close call. But this one falls on the wrong side of the Fourth Amendment.

VACATED AND REMANDED

HAMILTON, *Circuit Judge*, concurring. I join the court's opinion and judgment. I agree that the situation here is distinguishable from the *Terry* stop that was found permissible in *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013). For the reasons explained in my separate opinion in *Williams*, however, I believe that after recent expansions of legal rights to possess and display firearms, the stop in that case was not justified under *Terry v. Ohio*, 392 U.S. 1 (1968), and the myriad cases applying it. See 731 F.3d at 690–94 (Hamilton, J., concurring). There should be no need to distinguish this case from *Williams*. In both cases the officers received information that justified a police response. But in both cases, without more indications that a crime had been or was about to be committed, the information the police had did not justify the indignities and the sometimes severe restraints on liberty that we accept under the bland phrase "*Terry* stop."