In the

# United States Court of Appeals
### For the Seventh Circuit

No. 18-2796

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HERMAN D. ADAIR,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:17-cr-10053 — **James E. Shadid**, *Judge.*

ARGUED APRIL 11, 2019 — DECIDED JUNE 3, 2019

Before SYKES, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Officer Curtis Squires received a crime-in-progress notification while patrolling in Bloomington, Illinois during the late evening hours of September 21, 2017. More details followed. The 911 operator informed Officer Squires that a caller from the Tracy Drive Apartments reported a group of persons outside her apartment engaged in suspicious activity. The caller added that a short black male wearing a hoodie had a gun in his front pocket. Arriving

moments later, Officer Squires saw the group, approached to see what was going on, and observed that Herman Adair roughly fit the 911 caller's description and had a large bulge in his front pants' pocket. Adair sought to evade Officer Squires by moving and weaving throughout the larger group—trying to put others between Officer Squires and himself. Officer Squires then stopped and patted down Adair, finding a gun in his front pocket. The district court concluded that all of this respected the Fourth Amendment. We agree and affirm.

# I

The question presented turns on whether, under the totality of circumstances facing Officer Squires at the Tracy Drive Apartments, he had reasonable suspicion to stop and frisk Adair under the standard announced in *Terry v. Ohio*, 392 U.S. 1 (1968).

The full facts emerged during a suppression hearing in the district court. A few additional points warrant emphasis. Officer Squires received the emergency notification just after 10:45 p.m. The additional details came in a message transmitted by the 911 operator to the computer in Officer Squires's police car. According to the message, the 911 caller provided her first name and phone number and stated that she had just been outside and saw the group smoking, drinking, and engaged in "very suspicious activity." The caller added that, while she did not recognize anyone as living in the Tracy Drive Apartments, she walked by a short black male with a hoodie and saw he had a black gun in his front pocket. While driving to the location, Officer Squires spoke to the 911 operator and confirmed this information.

Officer Squires knew the Tracy Drive Apartments well. A seven-year veteran of the Bloomington Police Department, he had responded to the area many times to address reports of theft, burglaries, fights, and shots fired. He also knew local gangs to have a presence at the apartment complex. At the suppression hearing, Officer Squires testified to being concerned that, upon arriving at the Tracy Drive Apartments, he would encounter someone who did not live at the complex but was nonetheless outside drinking and carrying a gun. The concern, he underscored, was the product of seeing many times over that alcohol and guns do not mix well.

It took Officer Squires no more than two minutes to drive to the apartment complex. Upon exiting his car, he saw about ten people standing outside, just as the 911 caller reported. As he approached the group his attention focused on Herman Adair because he was relatively short and the only person (on an unusually warm September night) wearing long sleeves. Everyone else was wearing t-shirts and tank tops. Officer Squires testified he had encountered Adair many times before that night and immediately recognized him as not only someone who did not live at the Tracy Drive Apartments, but also the only person wearing clothing resembling the 911 caller's description. Officer Squires further testified that he knew Adair had a prior felony conviction. He added that each of his prior encounters with Adair had been respectful.

When Officer Squires first approached, Adair was standing near the middle of the larger group. As Officer Squires got closer, however, Adair began to move away, weaving through the group and putting other people in between himself and the officer. Officer Squires believed Adair was trying to evade and avoid him. He eventually got close enough to

Adair to see a conspicuous, large bulge in the front pocket of his jeans. Seeing the bulge raised even more concern because, as Officer Squires testified, he recalled the 911 caller reported seeing a gun protruding from a man's pocket.

Officer Squires reacted by asking Adair to step away from the group. He then asked for permission to search him. When Adair declined, Officer Squires told him that, due to the circumstances, he was going to pat him down for weapons. The ensuing frisk revealed a hard object that Officer Squires immediately recognized as a gun in Adair's front pocket. The firearm was a black and loaded Sig Sauer P230 handgun. Officer Squires testified that he knew at the time of the stop and pat down that Adair's prior felony conviction prevented him from possessing a firearm.

The government charged Adair with unlawful possession of a firearm by a felon, a violation of 18 U.S.C. § 922(g). Adair moved to suppress the firearm, arguing that Officer Squires lacked the reasonable suspicion required to stop and search him. The district court denied the motion. Adair then pleaded guilty, reserving the suppression issue for appeal, and the district court sentenced him to 46 months' imprisonment.

## II

Adair now renews his argument that Officer Squires lacked the reasonable suspicion necessary for the investigatory stop and protective pat down. Adair places substantial emphasis on a series of post-arrest photographs showing that he was not wearing a hoodie on the night in question. He sees the absence of the hoodie as controlling because it shows he did not match the 911 caller's description and thus eliminated

any basis for Officer Squires to focus on him and then to stop and search him.

Adair is right on one point but mistaken on another. He is right that the photos show no hoodie. But Adair goes too far in suggesting that the case begins and ends with that observation. Not so. The totality of the circumstances facing Officer Squires—including Adair's wearing clothing that generally resembled the 911 caller's description of the man with a gun and his clear evasion of Officer Squires—provided the reasonable suspicion necessary to authorize the stop and pat down.

A

The Supreme Court's decision in *Terry v. Ohio* teaches that the Fourth Amendment permits law enforcement to conduct a brief investigative stop when an officer reasonably suspects a person is engaged in criminal behavior. See 392 U.S. at 21–22; *Navarette v. California*, 572 U.S. 393, 396–97 (2014). While "inarticulate hunches" are not enough, *Terry*, 392 U.S. at 22, "'reasonable suspicion is a lower threshold than probable cause' and 'considerably less than preponderance of the evidence,'" *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (quoting *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011)).

The controlling inquiry requires an objective examination of the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Ruiz*, 785 F.3d at 1141 (quoting *Bullock*, 632 F.3d at 1012). Whether an officer had reasonable suspicion for an investigatory stop "is dependent upon both the content of the information possessed by police and its degree of reliability." See *Navarette*, 572 U.S.

at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Taking account of the "the whole picture" the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

These standards find straightforward application to Officer Squires's stop of Adair. Consider the context and circumstances facing Officer Squires. He responded to a 911 call of suspicious activity occurring late in the evening at a location known for criminal activity. He arrived within two minutes of receiving the crime-in-progress alert, and this quick response allowed him to benefit from and react to information freshly provided by the 911 caller. Nobody disputes that Officer Squires, in responding to the call, properly approached the group gathered in front of the apartment complex to learn more about what was happening. It was then that he saw a relatively short man wearing long sleeves—clothing that stood out from what others were wearing and most closely matched the 911 caller's description. It was also then, after Officer Squires recognized Adair as a convicted felon who did not live at the apartments, that Adair reacted by seeking to evade Officer Squires and thus avoid contact with the police.

The Fourth Amendment required no more to justify a stop. "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985) (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)). Based on the facts known at the time, Officer Squires reasonably concluded that Adair both sufficiently matched the 911 caller's description and reacted in a way that justified a *Terry* stop. While the 911 caller's information did not align exactly with what Officer Squires saw

upon arriving, perfection is not the measuring stick. See *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (explaining that "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials"). The judgment facing Officer Squires in the circumstances afforded him fair leeway: the Fourth Amendment did not require him, upon seeing that Adair was wearing a long-sleeved athletic shirt but not (literally) a hoodie, to disregard information from the 911 caller that proved largely corroborated. Nor did it require him to disregard Adair's evasion and instead return to his police car and leave the scene. The decision to stop Adair was well within reason.

Adair begs to differ by pointing to *Florida v. J.L.*, 529 U.S. 266 (2000). There the Supreme Court held that the police lacked reasonable suspicion for an investigatory stop when they acted on an anonymous tip providing nothing more than a barebones assertion that an individual standing at a bus stop and wearing a plaid shirt was carrying a gun. The tip included nothing else, including no suggestion of an ongoing emergency or crime. See *id*. at 268–69. Accordingly, the Court had little difficulty concluding that such a "bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]" fell short of authorizing a *Terry* stop. *Id*. at 271.

The circumstances in *J.L.* are a far cry from those Officer Squires encountered here. He responded to much more than an anonymous and threadbare tip. To the contrary, the 911 caller gave her first name and phone number and reported personally observing smoking and drinking and engaging in "very suspicious activity" late at night by a group of people

who did not live at the Tracy Drive Apartments. The caller also reported seeing one particular person—a short black man wearing a hoodie—with a gun in his front pocket. In responding, Officer Squires found the scene closely aligned with the caller's description.

There is even more. All of this happened late at night in a high-crime area and against the backdrop of Adair's evasive conduct upon seeing Officer Squires. See *United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (explaining that an investigatory stop was justified, in part, because it occurred during "essentially the middle of the night"); *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011) (considering "the time and the location of the [*Terry*] stop"); *United States v. Oglesby*, 597 F.3d 891, 893 (7th Cir. 2010) (explaining that an investigatory stop was justified, in part, because it occurred late at night in a high-crime area); see also *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (explaining that "[n]ervous, evasive behavior is another pertinent factor in determining reasonable suspicion" under *Terry*); *United States v. Ocampo*, 890 F.2d 1363, 1368 (7th Cir. 1989) (considering the suspect's demeanor and behavior as part of a *Terry*-stop analysis). On these facts, Officer Squires had reasonable suspicion to stop Adair.

Adair's only response is to focus on isolated details. He contends, for example, that the Tracy Drive Apartments was not an area of high crime. Adair insists that the true high-crime area was about 900 feet away in an area adjacent to the apartment complex. Even if Adair is right as a technical matter, he overstates the point. Officer Squires was on firm—and certainly reasonable—ground believing that he was responding to an emergency 911 call in a high-crime area. The

circumstances did not compel any more precise assessment as he arrived at the scene and reacted to what he saw.

Adair also posits that the actions of Officer Fosdick, another officer who responded to the call to the Tracy Drive Apartments, contradict Officer Squires's claim that he reasonably suspected Adair was the man described by the 911 caller. Adair points out that, upon arriving at the apartments, Officer Fosdick asked for and received consent to pat down two other men standing outside the apartment complex. He also sought and received permission to search the purse of a woman standing outside but stopped short of seeking consent to conduct a pat down because the woman was wearing tight clothing incapable of concealing a weapon.

The record provides no reason to doubt these observations about Officer Fosdick's conduct. But we fail to see how they compel a conclusion about Officer Squires and his response to the 911 call. By its terms, *Terry* requires an individualized inquiry—an assessment of the facts and circumstances pertinent to a specific person—here, Herman Adair. Or, to put the point more directly, the Supreme Court has cautioned us to avoid the exact "sort of divide-and-conquer analysis" Adair urges. See *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (explaining that the totality-of-the-circumstances approach mandated by *Terry* precludes evaluating certain factors in isolation from each other).

B

We come, then, to Officer Squires's decision to frisk Adair. See *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999) (explaining that not every investigatory stop will automatically entitle law enforcement to conduct a protective pat

down). In the course of an authorized investigatory stop, an officer may proceed to conduct a protective pat down when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger. See *Terry*, 392 U.S. at 27.

Upon arriving at the Tracy Drive Apartments, Officer Squires reasonably concluded that Adair matched the 911 caller's description of the armed man who was part of a group drinking and acting suspiciously outside the apartment complex. And this was especially so after Adair reacted to Officer Squires's presence by seeking to evade and avoid all contact with him. Officer Squires then saw for himself the bulge in Adair's front pocket, precisely as the 911 caller reported. At that point, no more was required to justify Officer Squires's belief that Adair was armed and dangerous. The subsequent protective pat down did not violate Adair's Fourth Amendment rights.

So, too, must we reject Adair's view that this case aligns with *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013). In *Williams* we considered an anonymous 911 report that a large group of people with guns were making noise late at night in a known high-crime area. See *id*. at 684. We concluded that the 911 call permitted an investigatory stop of those present but, without more, did not justify an officer's decision to go further and randomly pat down one of persons detained. See *id*. at 686–88. Altogether lacking was the individualized suspicion necessary to the more intrusive step of frisking someone's person: "[T]he 911 caller did not provide any information that would have identified Mr. Williams [the defendant] as one of the individuals in possession of a weapon" and "the Court cannot see how the group's general behavior could

possibly support a reasonable suspicion that Mr. Williams, himself, was armed and dangerous." *Id*. at 687.

The circumstances here are analogous in only a limited respect—Officer Squires encountered a group gathered late at night in a high-crime area. But the similarities with *Williams* end there. Unlike in *Williams*, the 911 caller here also reported gun possession by a specific person (a short black man wearing a hoodie) that reasonably led Officer Squires to focus on Herman Adair and then to witness both his evasive behavior and the large bulge in his front pocket. In no way did Officer Squires randomly pluck Adair from a larger group and then, without any reasonable basis for believing Adair may be armed and dangerous, subject him to a pat down. Put most simply, what was absent in *Williams*—particularized (and not just general) suspicion that a specific individual was armed and dangerous—was present here.

*     *     *

In the end, we see this as a case where Officer Squires acted swiftly and reasonably in response to a 911 call. While he did not encounter anyone wearing a hoodie, what he did see aligned largely with the caller's report. From there the totality of circumstances supplied Officer Squires with the individualized and particularized suspicion necessary to stop and frisk Adair. We therefore AFFIRM.