2021 IL 125954

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125954)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
DAVID CARTER, Appellant.

*Opinion filed December 16, 2021.*

JUSTICE MICHAEL J. BURKE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Overstreet, and Carter concurred in the judgment and opinion.

Justice Neville concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     Defendant, David Carter, was charged in the circuit court of Cook County with several weapons offenses, including being an armed habitual criminal, aggravated unlawful use of a weapon, and unlawful use or possession of a weapon by a felon.

Defendant filed a motion to quash arrest and suppress evidence, arguing that the arresting officer lacked reasonable suspicion to stop him. The circuit court denied the motion. Following a bench trial, defendant was convicted of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) and sentenced to nine years' imprisonment. The appellate court affirmed the circuit court's denial of defendant's motion to suppress, his conviction, and his sentence. 2019 IL App (1st) 170803. We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). For the reasons that follow, we affirm in part, reverse in part, and remand the cause for resentencing.

## I. BACKGROUND

On March 29, 2016, the State charged defendant with one count of being an armed habitual criminal (AHC), alleging that he "knowingly possessed a firearm, after having been convicted of the offense of armed robbery, under case number 10CF-367, and the offense of aggravated battery, under case number 09CF-2251." Defendant was also charged with four counts of unlawful use or possession of a weapon by a felon and four counts of aggravated unlawful use of a weapon.

Defendant filed a motion to quash his arrest and suppress evidence, alleging that the investigatory stop that resulted in his arrest violated the fourth amendment. At a hearing on the motion to suppress, Chicago police officer Robert Luzadder testified that he and his partner, who were in uniform and wearing duty belts with service weapons, were on patrol in a squad car on March 9, 2016, at about 11:36 p.m., when they received an Office of Emergency Management and Communications (OEMC) dispatch "stating a person who wished to remain anonymous [reported] a person with a gun that was walking with two females. Two female whites were walking with a male white wearing a black jacket, hoodie, and he was swinging at the females and that he has a gun on him." The caller said that the group was near the intersection of 33rd and Wallace Streets. Luzadder testified that the anonymous tipster's phone number had been recorded.

Luzadder arrived at the intersection two or three minutes after receiving the call, but he did not see anyone matching the individuals described by the anonymous caller. A second OEMC dispatch relayed additional information from the caller that "the people were now walking near 3100 South Lowe Avenue," approximately two

blocks to the north. Luzadder further testified that he and his partner relocated to that area within two to four minutes. At the second location, Luzadder saw defendant, a white male, who was wearing clothing described by the anonymous caller, walking east in the south alley of 31st Street and holding the right side of his waistband. Luzadder did not observe the two women described by the caller, nor did he see defendant violate any laws.

¶ 6        Luzadder explained that, during his 22 years of working as a police officer, his observations of hundreds of individuals carrying firearms in their clothing led him to believe that defendant was "attempting to conceal a firearm underneath his clothing." Luzadder acknowledged that in some instances in which he had observed people holding their waistbands the police had not recovered guns.

¶ 7        After Luzadder got out of the patrol car, with a hand on his service weapon, he ordered defendant to raise his hands, approach the squad car, and place his hands on the car. Because the call concerned a firearm and Luzadder had seen defendant holding his waistband, Luzadder patted down defendant for Luzadder's own safety. Luzadder patted down defendant over his clothes and felt what he believed to be the handle of a handgun. He then lifted defendant's shirt and recovered a nickel-plated revolver from defendant's waistband. Luzadder arrested defendant, at which time defendant made a statement related to the gun. After hearing the testimony and argument on defendant's motion to suppress, the circuit court denied the motion.

¶ 8        Defendant waived his right to a jury trial, and the State dismissed two of the counts of unlawful use or possession of a weapon by a felon. At defendant's bench trial, the parties stipulated to Luzadder's testimony from the suppression hearing. Luzadder provided brief, additional testimony regarding the statement made by defendant after the gun was found. According to Luzadder, defendant said, "I'm a 2-6, I'm on parole and I use this for protection against the SDs." Luzadder also testified that a five-shot revolver with one live round was recovered from defendant during the pat-down.

¶ 9        The State placed two exhibits into evidence: a certified copy of defendant's 2010 armed robbery conviction and a certified copy of defendant's 2009 aggravated battery conviction. The parties also stipulated that defendant did not have a valid Firearm Owner's Identification card or a concealed-carry license on the date that

Luzadder recovered the firearm from his person. The State rested its case-in-chief. Defendant elected not to testify, and the defense rested without calling any witnesses.

¶ 10    Following closing arguments, the court determined that the State had met its burden of proof beyond a reasonable doubt and convicted defendant on all remaining counts: one count of AHC, two counts of unlawful use or possession of a weapon by a felon, and four counts of aggravated unlawful use of a weapon. The court denied defendant's request for a new trial and sentenced him to nine years' imprisonment on the AHC count and merged the other counts.

¶ 11    On appeal, defendant argued that the circuit court erroneously denied his motion to quash arrest and suppress evidence because the police officers lacked a reasonable, articulable suspicion to conduct the investigatory stop that produced the gun, bullet, and statement that were admitted at trial. See *Terry v. Ohio*, 392 U.S. 1 (1968). The appellate court explained that, to justify a *Terry* stop, an officer must be able to point to specific and articulable facts that, taken together with rational inferences from those facts, support the conclusion that an individual has committed or is about to commit a crime. 2019 IL App (1st) 170803, ¶ 20. The court recognized that anonymous tips alone seldom provide law enforcement officers with the reasonable suspicion necessary to initiate a lawful investigatory stop because such tips generally fail to demonstrate the informant's basis of knowledge or veracity and, in such cases, an officer's corroboration of information contained in the anonymous tip becomes especially important. *Id.* ¶ 21.

¶ 12    The court concluded that Luzadder engaged in corroboration of the assertion of illegality provided by the tipster when he observed someone matching the description of the person provided by the caller at the location where the caller said he would be. Moreover, he corroborated the report that the person had a gun when he observed defendant walking in a manner that suggested he was concealing a firearm under his clothing. *Id.* ¶ 24. Luzadder's reasonable suspicion that defendant was armed further justified a protective pat-down search of his person to ensure Luzadder's own safety and the safety of others. *Id.* Because the firearm was recovered during a lawful search and seizure, the circuit court did not err in denying defendant's motion to quash arrest and suppress evidence. *Id.*

¶ 13 The appellate court next considered defendant's challenge to the sufficiency of the evidence supporting his AHC conviction. Defendant argued that the State had failed to prove that he had the requisite two qualifying predicate offenses required by the AHC statute. That statute provides:

> "§ 24-1.7. Armed habitual criminal.
>
> (a) A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:
>
>> (1) a forcible felony as defined in Section 2-8 of this Code;
>>
>> (2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child ***; intimidation; aggravated intimidation; gunrunning; home invasion; or aggravated battery with a firearm ***; or
>>
>> (3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher." 720 ILCS 5/24-1.7(a) (West 2016).

Armed robbery is not listed as a qualifying offense in either subsection (a)(2) or (a)(3), and the only types of aggravated battery listed are aggravated battery of a child and aggravated battery with a firearm. Thus, the court noted that defendant's convictions qualified only if they were considered " 'forcible felonies' " pursuant to subsection (a)(1). 2019 IL App (1st) 170803, ¶ 34. Defendant did not dispute that his armed robbery conviction was a forcible felony and therefore a proper qualifying predicate offense. *Id.* ¶ 36.

¶ 14 The court explained, however, that the only type of aggravated battery that qualifies as a forcible felony pursuant to section 2-8 of the Criminal Code of 2012 is " 'aggravated battery resulting in great bodily harm or permanent disability or disfigurement.' " (Emphasis omitted.) *Id.* ¶¶ 35-39 (quoting 720 ILCS 5/2-8 (West 2016)); *id.* ¶¶ 36-39. The certified copy of the aggravated battery conviction provided by the State to establish defendant's guilt of AHC did not specify the

aggravating factors underlying defendant's aggravated battery conviction. *Id.* ¶ 40. Defendant attached a copy of the aggravated battery indictment as an appendix to his appellate brief. *Id.* ¶ 41. The indictment showed that defendant was charged with two counts of aggravated battery. *Id.* ¶¶ 41-42. One count alleged the aggravating factor of use of a deadly weapon other than the discharge of a firearm. See 720 ILCS 5/12-4(b)(1) (West 2008). The other alleged the aggravating factor of being on a public way. See *id.* § 12-4(b)(8). Nevertheless, the court held that it could not consider the indictment, as defendant had merely attached it as an appendix to his appellate brief and had not moved to supplement the record. 2019 IL App (1st) 170803, ¶¶ 43-44.

¶ 15 The court ultimately rejected defendant's sufficiency of the evidence claim for two reasons. First, the court explained that it was defendant's burden to provide the appellate court with a sufficiently complete record on appeal and, in the absence of a complete record, the court must presume that the trial court's judgment conformed to the law and had a sufficient factual basis. *Id.* ¶ 44. Because of the lack of information in the record about defendant's aggravated battery conviction, the court said that it "necessarily" rejected his sufficiency of the evidence claim. *Id.* ¶¶ 44-45. Second, the court reiterated that, when reviewing a sufficiency of the evidence claim, it was required to construe the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Id.* ¶ 45. Because aggravated battery qualifies as a predicate felony in certain circumstances and because defendant did not challenge the State's assertion at trial that his aggravated battery conviction was a qualifying felony or provide any evidence that it was *not* a qualifying felony, the court held that it had no choice but to reject defendant's sufficiency argument. *Id.* The court denied that it was shifting the burden of proof to defendant to establish his innocence. *Id.*

¶ 16 We granted defendant's petition for leave to appeal. See Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 17                                    II. ANALYSIS

¶ 18                               A. Motion to Suppress

¶ 19        On appeal, defendant argues that his conviction must be reversed because the circuit court erred in denying his motion to quash arrest and suppress evidence obtained from a *Terry* stop that was not supported by reasonable suspicion in violation of the fourth amendment. Specifically, defendant contends that the anonymous tips were not sufficiently reliable to provide Luzadder with reasonable suspicion that defendant was engaged in criminal activity because (1) the information provided by the unnamed caller did not state the basis of the caller's knowledge or give predictive assertions that would allow the police to test the caller's credibility, (2) the tip that a man was assaulting two women was not corroborated by the police, which then called into question the reliability of the tip's assertion that the man had a gun, and (3) the officer's observation of defendant's act of walking with his hand on his waistband did not sufficiently corroborate the tip to justify the *Terry* stop.

¶ 20        The State responds that, considering the totality of the circumstances, Luzadder's investigatory stop was supported by reasonable suspicion. The State argues that the anonymous tips contained sufficient indicia of reliability and were corroborated by Luzadder's observations. The State contends that Luzadder's observation of defendant walking with his hand on his waistband, and his subjective inference from the same, independently corroborated the informant's report that defendant was carrying a firearm.

¶ 21        When reviewing the trial court's ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review. *People v. Timmsen*, 2016 IL 118181, ¶ 11. First, we afford great deference to the trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* Second, we review *de novo* the trial court's ultimate legal ruling on whether the evidence should be suppressed. *Id.* Consequently, a reviewing court remains free to engage in its own assessment of the facts in relation to the issues presented. *People v. Hackett*, 2012 IL 111781, ¶ 18. Further, we may consider evidence presented at defendant's trial in addition to the evidence presented during the suppression hearing. *People v. Almond*, 2015 IL 113817, ¶ 55. The facts here

are not in dispute, so we focus our analysis on the legal question of whether suppression was warranted.

¶ 22    Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The touchstone of the protection guaranteed by the fourth amendment is " 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 19).

¶ 23    Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime. *Id.* The investigatory stop (1) must be justified at its inception and (2) in justifying the intrusion, the officer must be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen. *Id.*

¶ 24    In determining whether the officer acted reasonably, we apply an objective standard and consider whether the facts available to the officer at the time of the stop warrant a person of reasonable caution to believe that the action taken was appropriate. *Id.* Though a reasonable, articulable suspicion is a less demanding standard than probable cause, an officer's suspicion must amount to more than an unparticularized suspicion or hunch of criminal activity. *Id.* When evaluating the validity of the stop, we must consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981).[1]

¶ 25    We agree with the State and the appellate court that the officers had the necessary reasonable suspicion for an investigatory stop. In *People v. Lampitok*, 207 Ill. 2d 231, 257-58 (2003), this court set forth several factors for determining

[1]Defendant was subjected both to an investigatory stop and a pat-down to check for weapons. Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid. *People v. Flowers*, 179 Ill. 2d 257, 263 (1997). Here, defendant has challenged only the legality of the investigatory stop.

whether officers have a sufficient reasonable suspicion when acting pursuant to information received in a tip:

> "In evaluating whether reasonable suspicion exists, the court should consider the quality and content of information known to officers as well as the reliability of the source of the information. See [*Alabama v. White*, 496 U.S. 325, 330 (1990)]; *People v. Ertl*, 292 Ill. App. 3d 863, 872-73 (1997). Certain factors can support a finding of reasonable suspicion, including corroboration of the tip through observation by officers (*White*, 496 U.S. at 331 \*\*\*), inclusion of details in the tip (*United States v. Tucker*, 305 F.3d 1193, 1201 (10th Cir. 2002)), explanation of the basis of knowledge of the tip by the informant (*Tucker*, 305 F.3d at 1201), and little passage of time between receiving tip and acting upon it by officers (see [*United States v. Payne*, 181 F.3d 781, 790 (6th Cir. 1999)]). Other factors can belie such a finding, including anonymity of the tipster (*People v. Carlson*, 313 Ill. App. 3d 447, 449-50 (2000); see also *Florida v. J.L.*, 529 U.S. 266, 274 \*\*\* (2000)), and absence of track record of supplying reliable information by known tipster (*People v. Lockhart*, 311 Ill. App. 3d 358, 362 (2000)). However, deficiency or uncertainty in the reliability of the informant can be compensated for by a strong level of detail and corroboration of the content of the tip, and vice versa. *White*, 496 U.S. at 330 \*\*\*; see *Lockhart*, 311 Ill. App. 3d at 362."

¶ 26 Although anonymous tips are generally considered less reliable, the United States Supreme Court in *Prado Navarette v. California*, 572 U.S. 393, 399-400 (2014) (*Navarette*), set forth certain factors that make them more reliable. First, anonymous tips are more reliable when the caller claims eyewitness knowledge of criminal activity. The court explained that " '[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.' " *Id.* at 399 (quoting *Illinois v. Gates*, 462 U.S. 213, 234 (1983)). Second, anonymous tips are considered more reliable when the tipster is reporting possible criminal activity shortly after it happened. In *Navarette*, the anonymous tipster gave a description of a truck that allegedly ran her off the road, and the police located a truck matching the description approximately 18 minutes after the call was placed. The court stated:

"That timeline of events suggests that the caller reported the incident soon after she was run off the road. That sort of contemporaneous report has long been treated as especially reliable." *Id.*

Finally, a caller's use of the 911 emergency system is a further indicator of veracity. *Id.* at 400. The court explained that a "911 call has some features that allow for identifying and tracing callers, and thus provides some safeguards against making false reports." *Id.* Such calls can be recorded, giving victims an opportunity to identify a false tipster's voice and subject him to prosecution. *Id.* Moreover, the 911 system "permits law enforcement to verify important information about the caller." *Id.* at 401. Finally, "although callers may ordinarily block call recipients from obtaining their identifying information, FCC regulations exempt 911 calls from that privilege." *Id.* For all these reasons, "a reasonable officer could conclude that a false tipster would think twice before using such a system." *Id.* The court explained that it was not holding that 911 calls are *per se* reliable but merely that the use of the 911 system is one of the relevant circumstances that can justify an officer's reliance on the information reported in the call. *Id.*

¶ 27    Here, Luzadder's decision to stop defendant was supported by the totality of the circumstances. Although this case involves an anonymous tip, the tip had sufficient indicia of reliability and independent corroboration. First, the anonymous tip was placed through the 911 system, which is a relevant circumstance that can justify an officer's reliance on the information. See *id.* Second, it was a reasonable inference that the tipster was observing possible criminal activity firsthand, as the tipster was able to give real-time, updated information about the defendant's location. When the group moved to a different location, the tipster placed a second call. See *id.* at 399 (tip more reliable when tipster has eyewitness knowledge of possible criminal activity). Third, the tipster relayed the information about possible criminal activity shortly after it happened. See *id.* (noting that contemporaneous reports are considered especially reliable).

¶ 28    Moreover, when Luzadder arrived at the scene, he was able to corroborate important aspects of the information. Luzadder immediately saw someone matching defendant's description, and Luzadder observed that defendant appeared to be concealing a firearm under his clothes. This belief was based on Luzadder's 22 years of experience as a police officer, during which time he had observed

hundreds of individuals concealing firearms under their clothing. And, given that the tipster had reported that defendant was armed and had just been engaging in threatening behavior toward two women, Luzadder had the requisite reasonable suspicion for a *Terry* stop.

¶ 29　　Arguing against this conclusion, defendant claims that this case is similar to *Florida v. J.L.*, 529 U.S. 266 (2000). There, the Supreme Court found that an anonymous caller's tip that a young black man, at a specified location and wearing a plaid shirt, had a gun was insufficient to justify an investigatory stop. *Id.* at 268, 274. After receiving the anonymous call, the officers went to the scene where they found a young black man wearing a plaid shirt. *Id.* at 268. Apart from the tip, the officers had no reason to suspect the man of illegal conduct. *Id.* Although the man made no threatening or suspicious movements, police stopped and frisked him and seized a gun. *Id.* The prosecution charged the defendant with carrying a concealed firearm without a license and possessing a firearm while under the age of 18. *Id.* at 269. The trial court granted the defendant's motion to suppress the gun as the fruit of an unlawful search. *Id.* An intermediate appellate court reversed, but the Supreme Court of Florida held the search invalid under the fourth amendment. *Id.* (citing *J.L. v. State*, 727 So. 2d 204 (Fla. 1998)). The United States Supreme Court affirmed, finding that the tip did not show sufficient reliability to justify the stop. The Court explained:

> "[T]he officers' suspicion that J. L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. ***
>
> ***
>
> *** The anonymous call *** provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [the defendant] of engaging in unlawful conduct ***.

* * *

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 270-72.

¶ 30 In addition, the Court declined to adopt a firearm exception to *Terry*. Although recognizing the danger of guns, the Court stated that any such rule would enable a person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. *Id.* at 272. Thus, the court held that the fourth amendment does not permit the police to conduct *Terry* frisks based on "bare-boned tips about guns." *Id.* at 273.

¶ 31 Defendant views *J.L.* as controlling, but we find it readily distinguishable. First, the *J.L.* court specifically noted that "[a]part from the tip, the officers had no reason to suspect [the defendant] of illegal conduct" (*id.* at 268) and that "the officers' suspicion that J. L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller" (*id.* at 270). Here, by contrast, Officer Luzadder observed conduct that led him to believe that defendant was concealing a firearm under his clothes. Second, the tip in *J.L.* did not come in through the 911 system, and the court noted that the call had not been recorded. See *id.* at 268. Third, there was no indication in *J.L.* that the tipster had firsthand knowledge of any criminality or had been an eyewitness to it. Fourth, defendant contends that *J.L.* stands for the proposition that "[t]ips, such as the one at issue, that simply claim an identifiable person is in possession of a firearm are not reliable enough to support a seizure." However, the tip at issue here did not simply claim that an identifiable person was in possession of a firearm. Rather, the tip was that the person carrying the firearm was engaging in threatening behavior toward other individuals. The tipster reported not only that the individual was carrying a firearm but that he was "swinging at" "two females." As the Seventh Circuit explained in *United States v. Hicks*, 531 F.3d 555, 558-59 (7th Cir. 2008):

"Every circuit to consider the question, including this one, has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency, *United States v. Brown*, 496 F.3d 1070, 1077 (10th Cir.2007); *United States v. Elston*, 479 F.3d 314, 319 (4th Cir.2007); [*United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006)]; *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir.2004); *Anthony v. City of New York*, 339 F.3d 129, 136-37 (2d Cir.2003); *United States v. Holloway*, 290 F.3d 1331, 1338-39 (11th Cir.2002), or very recent criminal activity, *Terry-Crespo*, 356 F.3d at 1176-77; *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000). The *J.L.* court itself acknowledged that it was not deciding whether an anonymous tip alleging a greater danger than mere possession of a firearm might justify a search based on a lesser showing of reliability. *Id.* at 273-74 ***; *see also United States v. Goodwin*, 449 F.3d 766, 769-70 (7th Cir.2006)."

¶ 32    In *United States v. Simmons*, 560 F.3d 98, 101 (2d Cir. 2009), officers on patrol received a dispatch of an assault in progress, with the possible involvement of a gun. The description of the suspect was of a " 'male black, wearing a grey hoody, black jacket.' " *Id.* The dispatch was based on a 911 call from an anonymous caller. *Id.* When the officers arrived at the apartment building where the assault was allegedly occurring, they encountered a group of individuals outside the building. The officers asked whether anyone was being beaten up and were told " 'no.' " *Id.* The officers did not see anyone being assaulted or any evidence that an assault had occurred. *Id.* Officer McHugh then looked through the window on the building's front entrance and saw three individuals in the lobby. One of them, the defendant, was a black male wearing a gray hooded sweatshirt and a black jacket, but there was no indication that he was involved in an assault. *Id.* When the officers entered the building, the defendant walked toward them with his hands in his jacket pockets. *Id.* When McHugh told him to " 'hold on a second,' " he kept walking. *Id.* The officer again told him to " 'hold on a second.' " *Id.* This time, the defendant stopped, and the officer told him to remove his hands from his pockets. *Id.* The defendant did not do so, and McHugh again told him to remove his hands from his pockets. *Id.* When the defendant still did not comply, McHugh grabbed the defendant's right side, where he felt the butt of a gun. McHugh said, " 'he's packing,' " and the officers then searched the defendant and recovered two firearms. *Id.* The defendant was placed under arrest. *Id.*

¶ 33    The district court denied the defendant's motion to suppress, finding that the officers had a sufficient reasonable suspicion that the defendant was engaged in criminal activity. *Id* at 101-02. The Second Circuit affirmed. The court distinguished *J.L.* on the basis that the anonymous 911 call in the case before it had reported an assault in progress, while the *J.L.* tip merely reported possession of a firearm. *Id.* at 104. The Second Circuit stated that it agreed with its sister circuits that "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *Id.* at 105. Thus, "[g]iven the greater reliability of an emergency 911 call, the requisite level of corroboration is lower." *Id.* The court explained that this approach recognizes the need for the police to respond to emergency situations without delay, while still requiring police to corroborate the allegations in some meaningful way. *Id.* Notably, the court found sufficient corroboration of the tip, even though the officers did not see an assault in progress or any evidence that such an assault had occurred.

¶ 34    Similarly, here, the officers were acting on an anonymous 911 call that a man in possession of a firearm was swinging at "two females." While they did not see the females, they located a person who fit the description of the man, and he appeared to be holding a firearm under his clothing. Defendant notes Luzadder's testimony that he had also seen people secure innocent items in their waistbands, and he also points out that there are numerous innocent reasons for a person to walk with his hand on his waistband. In making this argument, defendant is not looking at Officer Luzadder's observation in context. Luzadder was not merely on patrol when he noticed someone walking with his hand on his waistband. Rather, he was responding to a tip that a person matching defendant's description was in possession of a firearm and was swinging at two females. Moreover, the Supreme Court has explained the obvious point that innocent behavior frequently provides the necessary reasonable suspicion for a *Terry* stop:

> "We said in *Reid v. Georgia*, 448 U. S. 438 (1980) (*per curiam*), 'there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot.' *Id.*, at 441. Indeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.' 392 U. S. at 22; see also *Cortez*, *supra*, at 417-419. We noted in *Gates*, 462 U. S., at 243-244, n. 13,

that 'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry." *United States v. Sokolow*, 490 U.S. 1, 9 (1989).

See also *Timmsen*, 2016 IL 118181, ¶ 44 (Thomas J., specially concurring) (noting that, in a reasonable suspicion analysis, the behavior the police observe will not be obviously illegal; if they observed obviously illegal activity, then the probable cause standard would be met).

¶ 35    For all the above reasons, we agree with the lower courts that no fourth amendment violation occurred. The "totality of the circumstances—the whole picture" (*Cortez*, 449 U.S. at 417) showed that the police were notified of a call placed through the 911 system from someone who appeared to be witnessing an assault in progress by an armed perpetrator. The police went to the location and observed someone who matched the perpetrator's description, walking as if he was concealing a firearm under his clothing. In these circumstances, the police had the requisite reasonable suspicion to conduct a *Terry* stop.

¶ 36                                 B. Sufficiency of the Evidence

¶ 37    Defendant next argues that his AHC conviction must be reversed because the State presented insufficient evidence of his guilt. Specifically, defendant argues that the State's evidence did not establish that his 2009 aggravated battery conviction was a qualifying predicate felony. The defendant contends that, when the appellate court rejected this argument, it improperly shifted the burden of proof to him to establish his innocence. In this court, the State refuses to defend the appellate court's analysis and simply concedes that it did not meet its burden of proof. The State acknowledges that the only type of aggravated battery that qualifies as a forcible felony is "aggravated battery resulting in great bodily harm or permanent disability or disfigurement." See 720 ILCS 5/2-8 (West 2016). The State further concedes that the certified copy of the aggravated battery conviction that it used to establish defendant's guilt of AHC did not specify what type of aggravated battery defendant was convicted of, nor did the State introduce into evidence any other

- 15 -

details of the aggravated battery. The State argues that, absent any evidence that defendant's aggravated battery resulted in great bodily harm or permanent disability or disfigurement, there is insufficient evidence that defendant was convicted of a qualifying forcible felony. See *People v. Ephraim*, 2018 IL App (1st) 161009, ¶ 14 (conviction for aggravated battery to a peace officer was not a qualifying forcible felony without proof that the underlying battery resulted in great bodily harm or permanent disability or disfigurement).

¶ 38     We accept the State's concession, and we agree with the State that it did not establish defendant's guilt of AHC beyond a reasonable doubt. Nevertheless, we must briefly address the appellate court's analysis, as it contains errors that should not be repeated. See *People v. Green*, 225 Ill. 2d 612, 620-21 (2007) (this court will reach issue it otherwise would not have to when the appellate court's analysis "contains an error so fundamental" that this court is "compelled to correct it rather than risk its repetition").

¶ 39     The appellate court gave several reasons for rejecting defendant's sufficiency of the evidence argument, none of which has any merit. First, the court cited the principle that the appellant " ' "has the burden of providing a sufficiently complete record on appeal so that the reviewing court is fully informed regarding the issues to be resolved" ' " and that, " ' "in the absence of such a record on appeal, it is presumed that [the] trial court's judgment conforms to the law and has a sufficient factual basis." ' " 2019 IL App (1st) 170803, ¶ 44 (quoting *People v. Moore*, 377 Ill. App. 3d 294, 300 (2007), quoting *People v. Odumuyiwa*, 188 Ill. App. 3d 40, 45-46 (1989)). This principle has no application here. The principle the appellate court cited applies when the reviewing court is unable to review a claim because the appellant has not provided the court with a complete record. For instance, in *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984), this court held that there was no basis for concluding that the trial court abused its discretion in denying a motion to vacate a judgment order when this court had not been provided with a transcript of the hearing on the motion to vacate. Here, it is not clear why the appellate court believed that the record was incomplete. The record contains everything the State submitted in support of its case. The incompleteness is not in the record but *in the State's case*. To be clear, the principle that doubts arising from the incompleteness of the record are resolved against the appellant does not mean that doubts arising from the incompleteness of the State's proof are resolved against the defendant.

¶ 40    Next, the appellate court acknowledged that defendant attached as an appendix to his appellate brief the indictment from his aggravated battery case to establish that he was not charged with aggravated battery causing great bodily harm or permanent disability or disfigurement. 2019 IL App (1st) 170803, ¶¶ 41-42. The appellate court held that it could not consider it because the inclusion of information in the appendix to the brief is not a proper way to supplement the record. *Id.* ¶ 44. Here, however, the material in the appendix was irrelevant, as the deficiencies in the State's case were apparent on the face of the record. It was the State's burden to prove defendant's guilt, not defendant's burden to prove his innocence.

¶ 41    Next, the appellate court noted that at trial defense counsel "did not dispute the certified copy of conviction or argue that defendant's aggravated battery conviction was not based on his infliction of great bodily harm or permanent disability or disfigurement on his victim" (*id.* ¶ 40) and that "defense counsel did not challenge the State's contention at trial that his aggravated battery conviction satisfied the armed habitual criminal statute's predicate offense requirement" (*id.* ¶ 45). The court also said that, given the lack of evidence in the record to substantiate defendant's claim that his aggravated battery conviction was *not* a qualifying conviction, the court had no choice but to reject his sufficiency of the evidence claim. *Id.* We agree with defendant that the appellate court improperly shifted the burden of proof to defendant to establish his innocence. The State was required to introduce sufficient evidence to establish beyond a reasonable doubt that defendant had the necessary qualifying felonies to establish defendant's guilt of AHC. See *People v. Brown*, 2013 IL 114196, ¶ 48 ("The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged."). Defendant had no obligation to introduce any evidence about his aggravated battery conviction. Moreover, it does not matter that defendant did not raise this argument in the trial court, as challenges to the sufficiency of the evidence may be made for the first time on appeal. *People v. Woods*, 214 Ill. 2d 455, 470 (2005).

¶ 42    Finally, the court noted that, when it reviews a challenge to the sufficiency of the evidence, it is obligated to "view the evidence in the light most *favorable* to the prosecution and determine whether *any* rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt." (Emphases in

- 17 -

original.) 2019 IL App (1st) 170803, ¶ 45. The court noted that aggravated battery is a proper qualifying felony in certain circumstances and explained that the record contained no evidence about the nature of defendant's aggravated battery conviction. *Id.* The court apparently believed that its obligation to view the evidence in the light most favorable to the prosecution meant that it was required to presume that the aggravated battery conviction was a proper qualifying felony. The court misapplied the standard of review. A proper application of it should have led the court to the opposite conclusion. Even viewing the evidence in the light most favorable to the prosecution, the State's proof included *no evidence* that defendant's aggravated battery resulted in great bodily harm or permanent disability or disfigurement. Thus, no rational trier of fact could have found that it was a proper qualifying felony. A reviewing court's obligation to view the evidence in the light most favorable to the prosecution does not mean that the reviewing court construes the record to contain evidence that the State failed to produce.

¶ 43       For all the above reasons, we agree with defendant and the State that the State failed to prove defendant guilty beyond a reasonable doubt of AHC. The appellate court's conclusion to the contrary misapplied basic principles of appellate review and criminal procedure and improperly shifted the burden of proof to defendant to establish his innocence.

¶ 44                                III. CONCLUSION

¶ 45       The *Terry* stop of defendant was supported by the requisite reasonable suspicion. Accordingly, the trial court did not err in denying defendant's motion to suppress, and we affirm the appellate court's judgment upholding denial of the motion. The evidence was insufficient to establish defendant's guilt of AHC. We therefore reverse defendant's conviction. Because defendant's convictions for aggravated unlawful use of a weapon and unlawful use of a weapon by a felon were merged into his AHC conviction, we remand the cause for resentencing.

¶ 46       Appellate court judgment affirmed in part and reversed in part.

¶ 47       Circuit court judgment affirmed in part and reversed in part.

¶ 48    Cause remanded.

¶ 49    JUSTICE NEVILLE, concurring in part and dissenting in part:

¶ 50    I agree with that portion of the majority opinion that found the evidence was insufficient to establish defendant's guilt of being an armed habitual criminal (AHC). I disagree, however, with the majority's decision that the police had the necessary reasonable suspicion for conducting a *Terry* stop based upon two anonymous 911 calls and the arresting officer's observations. The majority fails to analyze the facts in this case based on the reasoning articulated in *Terry* v. *Ohio*, 392 U.S. 1 (1968), and *Florida v. J.L.*, 529 U.S. 266 (2000). In my view, those cases are controlling. Accordingly, I concur in part and dissent in part.

¶ 51    My divergence from the majority opinion does not undermine my concern for the safety of all citizens in Illinois. However, if defendant's actions were sufficient to warrant a *Terry* stop, then anyone walking with a hand on his or her waist may be stopped. Consequently, the majority's analysis establishes an unconstitutional expansion of the rationale and boundaries of *Terry*.

¶ 52                                    BACKGROUND

¶ 53    Following an investigatory stop, defendant was charged with one count of AHC, four counts of unlawful use or possession of a weapon by a felon, and four counts of aggravated unlawful use of a weapon. Defendant filed a motion to quash his arrest and suppress evidence, alleging that the investigatory stop that resulted in his arrest violated the fourth amendment.

¶ 54    At a hearing on the motion, Officer Luzadder testified regarding two 911 calls received through the office of emergency management and communications (OEMC). He testified that he received a dispatch "stating a person who wished to remain anonymous [reported] a person with a gun that was walking with two females. Two female whites were walking with a male white wearing a black jacket, hoodie, and he was swinging at the females and that he has a gun on him." The caller said that the group was near the intersection of 33rd and Wallace Streets.

Luzadder testified that the anonymous tipster's phone number had been recorded, but he did not know the identity of the caller.

¶ 55    Luzadder arrived at the intersection two or three minutes after receiving the call, but he did not see anyone matching the individuals described by the anonymous caller. A second OEMC dispatch relayed additional information from the caller that "the people were now walking near 3100 South Lowe Avenue," approximately two blocks to the north. Luzadder further testified that he and his partner relocated to that area within two to four minutes. At the second location, Luzadder saw defendant, a white male, who was wearing clothing similar to that described by the anonymous caller, walking east in the south alley of 31st Street and holding the right side of his waistband. Luzadder did not observe the two women described by the caller, nor did he see an assault. He further conceded that he did not see defendant with a gun or violating any laws.

¶ 56    Luzadder explained that, during his 22 years of working as a police officer, his observations of hundreds of individuals carrying firearms in their clothing led him to believe that defendant was "attempting to conceal a firearm underneath his clothing." Luzadder admitted that, in some instances in which he had observed people holding their waistbands, the police had not recovered guns. After the hearing, the circuit court denied defendant's motion.

¶ 57    The State dismissed two of the unlawful use or possession of a weapon by a felon counts. Following a bench trial, the court determined that the State had met its burden of proof beyond a reasonable doubt and convicted defendant on all remaining counts. The court denied defendant's request for a new trial and sentenced him to nine years' imprisonment on the AHC count and merged the other counts.

¶ 58    On appeal, defendant argued that the circuit court erroneously denied his motion to quash arrest and suppress evidence because the police officers lacked a reasonable, articulable suspicion to conduct the investigatory stop that produced the gun, bullet, and statement that were admitted at trial. The appellate court concluded that Luzadder's observations corroborated the assertion of illegality provided by the tipster when he saw someone similar to the general description of the person provided by the caller at the location where the caller said he would be. 2019 IL App (1st) 170803, ¶ 24. Moreover, he corroborated the report that the person had a

gun when he observed defendant walking in a manner that suggested he was concealing a firearm under his clothing. *Id.*

¶ 59                                    ANALYSIS

¶ 60     Before this court, defendant contends that Officer Luzadder's observations failed to corroborate that he was committing, was about to commit, or had committed any criminal activity. Defendant further contends that the anonymous tips were not sufficiently reliable to provide Officer Luzadder with reasonable suspicion to conduct the *Terry* stop. I agree with both of defendant's contentions.

¶ 61                  A. *Terry* Required Additional Police Investigation

¶ 62     *Terry* establishes the constitutional foundation for police encounters with citizens on the street. *Terry*, 392 U.S. at 27. *Terry* provides police officers with a narrowly drawn authority to detain people and search for weapons where, based on their observations, they reasonably believe that criminal activity is involved and that the person seized may be armed and presently dangerous. *Id. Terry* holds that, where a police officer observes unusual conduct that leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions. *Terry*, 392 U.S. at 30.

¶ 63     I disagree with the majority that Officer Luzadder engaged in corroboration of the assertion of illegality provided by the tipster and possessed reasonable suspicion that defendant was engaged in criminal activity at the time of the *Terry* stop. *Supra* ¶ 25. Officer Luzadder was notified of two 911 calls reporting an assault with a gun. Upon arriving at the second location, Officer Luzadder saw a white male in a black hoodie walking down an alley with his hand on his waistband. Contrary to the information supplied by the tipster, the officer saw no women, no assault, no gun, and no unusual behavior by defendant. Accordingly, the anonymous tips in this case did not and could not support a *Terry* stop unless they were supplemented by further police investigation. See *Alabama v. White*, 496 U.S. 325, 330 (1990) (finding that, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion); *Adams v. Williams*,

407 U.S. 143, 147 (1972) (some tips so devoid of indicia of reliability as to require further investigation before a forcible stop of a suspect would be authorized).

¶ 64 The majority observes that innocent behavior can provide the necessary reasonable suspicion. *Supra* ¶ 34. However, the majority fails to recognize the critical point under *Terry* that innocent conduct must be accompanied by (1) repetitiveness, (2) furtive movement, (3) unusual conduct, or (4) suspicious behavior. This is required to show that criminal activity had happened, was happening, or was about to happen. *Terry*, 392 U.S. at 22-23, 27. Indeed, *Terry* itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation. *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (citing *Terry*, 392 U.S. at 22).

¶ 65 I would find that the officers' observations of defendant's innocent, noncriminal acts and the uncorroborated information known to the officers at the time of the *Terry* stop would not warrant a reasonable and prudent officer to believe that a crime had been, was being, or was about to be committed or that their safety or that of others was in immediate danger. See *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *Terry*, 392 U.S. at 27-28. Absent was a particularized and objective basis for believing that defendant was engaged in criminal conduct, which remains a necessary antecedent to an investigative stop. *Terry*, 392 U.S. at 28; *J.L.*, 529 U.S. at 272 (finding that the likelihood of criminal activity is central in anonymous tip cases); *People v. Cherry*, 2020 IL App (3d) 170622, ¶ 24 (determining that the corroboration of wholly innocent activity does not lend any credibility to the informant's claim that the man possessed a gun). Consequently, the police officers were required to conduct additional observation of defendant prior to the investigatory stop to justify reasonable suspicion of criminal activity on the part of defendant.

¶ 66 B. The Anonymous 911 Calls Were Not Corroborated

¶ 67 The majority acknowledges that any deficiency or uncertainty in the reliability of the informant can be compensated for by a strong level of detail and corroboration of the content of the tip, and vice versa. *Supra* ¶ 25. The majority finds that, under the totality of the circumstances, the anonymous tips had sufficient

- 22 -

indicia of reliability and independent corroboration to support the *Terry* stop. *Supra* ¶ 27. I disagree.

¶ 68        The majority neglects to comprehend that the corroboration only extended to the general description of what defendant was wearing and the general description of his location. The majority contends that these were "important aspects of the information." *Supra* ¶ 28. In my view, this is error. The majority fails to concede that the officers, arriving within minutes of receiving the two calls, did not corroborate the most significant aspects of the anonymous tips: two women being assaulted and the assault itself. Further, there was no one waving a gun at either location that the anonymous tipster provided. *White*, 496 U.S. at 329 (finding that an anonymous phone tip may form the basis of a *Terry* stop only where it provides information from which one may conclude that the caller is honest and his information reliable, often referred to as "indicia of reliability").

¶ 69        The majority relies on *Prado Navarette v. California*, 572 U.S. 393, 399-400 (2014), for the proposition that factors that make anonymous tips more reliable include eyewitness knowledge, a contemporaneous report of criminal activity, and the use of the 911 system. In *Prado Navarette*, the majority found that, where the caller reported she had been run off the road by a specific vehicle with its license plate number, officers' subsequent confirmation of the truck's description and location near a mile marker reported by the caller indicated eyewitness knowledge, which supported the truth of the information. *Id.* The *Prado Navarette* majority also found that an indicator of veracity was the caller's use of the 911 emergency system. *Id.* at 400.

¶ 70        However, I am persuaded by the *Prado Navarette* dissent, which disagreed that an indicator of veracity is the anonymous tipster's mere use of the 911 emergency system. *Id.* at 409 (Scalia, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.). The *Prado Navarette* dissent recognized that recent technological and regulatory developments suggest that the identities of unnamed 911 callers are increasingly less likely to remain unknown, and the systems can identify the caller's geographic location with increasing specificity. *Id.* The dissent reasoned that, even assuming the ease of identifying 911 callers, it proves absolutely nothing unless the anonymous caller was aware of that fact. *Id.* " 'It is the tipster's belief in anonymity, not its reality, that will control his behavior.' [Citation.] There is no reason to

believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable." (Emphases omitted.) *Id.*; see also *Commonwealth v. Depiero*, 42 N.E.3d 1123, 1128-29 (Mass. 2016) (declining to credit any indicia of reliability to the unidentified caller's information merely because the information was transmitted in the form of a 911 telephone call).

¶ 71 The *Prado Navarette* dissent is consistent with our long-standing precedent regarding informant tips that the degree to which the caller is willing to expose his or her identity is relevant to determining the informant's veracity. *People v. Lampitok*, 207 Ill. 2d 231, 257 (2003) (in determining whether reasonable suspicion exists, the court should consider the quality and content of the information known to the officers as well as the reliability of the source of the information (citing *White*, 496 U.S. at 330)); *People v. Jackson*, 348 Ill. App. 3d 719, 730 (2004). Officer Luzadder testified that the 911 call was recorded by OEMC; however, he did not know the identity of the caller. Since the caller chose to remain anonymous, Officer Luzadder could not rely on the caller's reliability for providing accurate information. See *White*, 496 U.S. at 330.

¶ 72 In fact, as observed by the *Prado Navarette* dissent, "[i]t is more precise to say that the officer's observation discredited the informant's accusation: The crime was supposedly occurring (and would continue to occur) in plain view, but the police saw nothing." (Emphasis omitted.) *Prado Navarette*, 572 U.S. at 412 (Scalia, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.). Similarly, in the instant case, the officers arrived within minutes of the calls yet did not observe the alleged criminal behavior reported by the caller, calling into question the caller's honesty and reliability. Here, absent a strong level of detail and corroboration of the content of the tip, the anonymous 911 calls lacked sufficient indicia of reliability to support reasonable suspicion for the *Terry* stop. See *White*, 496 U.S. at 330.

¶ 73 C. *Florida v. J.L.* Is Controlling

¶ 74 The majority points out that *J.L.* has been distinguished by numerous courts on the basis that the tip was not one of general criminality but of an ongoing emergency. *Supra* ¶ 31. The majority disregards that here, where the officers did not observe the reported assault of two women at two separate locations, the tip concerned only general criminality in that it reported a person with a gun.

- 24 -

¶ 75    The *J.L.* Court noted that it was unremarkable that a tip was able to provide accurate information about the location and appearance. *J.L.*, 529 U.S. at 272. The Court recognized that these features are readily observable by anyone and, in any event, do not provide the reasonable suspicion of criminal activity necessary to support a *Terry* stop. *Id.* I am firm in my belief that *J.L.* is persuasive and applicable to the facts of this case.

¶ 76    I recognize that courts have found that reports of emergencies have a special reliability, requiring a lower level of corroboration. *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018); *People v. Allen*, 409 Ill. App. 3d 1058, 1072 (2011) (applying a less rigorous standard of corroboration when the tip concerns an imminent threat to public safety). However, as the court noted in *Watson*, an anonymous tip about an emergency may lack that special reliability. *Watson*, 900 F.3d at 896. In *Watson*, the court reasoned that, even if the caller's use of 911 and report of boys playing with guns made the officers worry about an emergency, that worry should have dissipated when the officers arrived at the scene. *Id.* What the officers saw did not match the caller's report, as no one was playing with guns. *Id.* The court recognized that, if there had been a potential emergency at the time of the call, it no longer existed when the police arrived. *Id.*

¶ 77    Further, anonymous tips about emergencies cannot always be trusted, as fraudulent 911 calls are agreed to be a dangerous problem. *United States v. Hicks*, 531 F.3d 555, 560 (7th Cir. 2008); see also Rana Simpson, U.S. Dep't of Justice, Office of Cmty. Oriented Policing Serv., Problem-Oriented Guides for Police Series No. 19, *Misuse and Abuse of 911*, at 5-7 (2002), https://popcenter.asu.edu/sites/default/files/problems/pdfs/Misuse_and_Abuse_of_911.pdf [https://perma.cc/2GKQ-7KAC].

¶ 78    When Officer Luzadder and his partner arrived, what they saw did not match the caller's report. The behavior reportedly witnessed by the caller was no longer occurring. If, as claimed by the anonymous tips, there ever was an emergency—an alleged assault of two women, which the officers did not corroborate—at the time the officers arrived at the second location there was no longer an alleged emergency. Moreover, there was no testimony from the officer that anyone was in danger, including the two arriving officers. See *Terry*, 392 U.S. at 27.

¶ 79    The majority finds significance in Officer Luzadder's alleged corroboration that defendant was carrying a gun because he was walking with a hand on his waist. *Supra* ¶ 31. According to the majority, Officer Luzadder observed defendant walking with his hand on his waist, the officer believed that defendant appeared to be concealing a gun, and this belief was based on Luzadder's 22 years of experience. Yet Officer Luzadder admitted that he had also seen people holding their waistbands for innocent purposes, and the police had not recovered guns or other contraband in those cases. It is axiomatic that conduct engaged in by other defendants—holding their hands on the waistbands of their pants—that was observed by an officer during 22 years of making arrests does not provide a reasonable suspicion of criminal activity that justifies a stop of a person the officer does not know, who is observed holding his hand on the waistband of his pants. Officer Luzadder's subjective belief that defendant was carrying a gun was a pretext to justify stopping defendant and was legally insufficient to provide an objective reasonable suspicion that defendant had been, was, or was going to be involved in criminal activity. See *Lampitok*, 207 Ill. 2d at 255 (finding that an officer's subjective belief that he has sufficient suspicion to justify the intrusion is inadequate to satisfy the objective reasonable suspicion standard). Thus, we have nothing more than an anonymous tip of a person with a gun, and under *J.L.*, that is insufficient to justify an investigatory stop.

¶ 80                      D. The Majority's Reliance on *Simmons* Is Misplaced

¶ 81    The majority relies on *United States v. Simmons*, 560 F.3d 98, 101 (2d Cir. 2009), for the proposition that although officers responded to an assault which they did not see, there was still sufficient corroboration for the investigatory stop. *Supra* ¶¶ 32-34. I find this reliance misplaced.

¶ 82    The officers in *Simmons* arrived on the scene two minutes after being dispatched to the location and observed the defendant in that same location. *Simmons*, 560 F.3d at 101. The officers observed the defendant walking toward them with his hands in his pockets. The officers ordered the defendant to " 'hold on a second,' " but the defendant continued walking, the officer again ordered the defendant to " 'hold on a second,' " and the defendant stopped. *Id.* He was told to

remove his hands from his pockets. The defendant did not remove his hands. He was asked a second time to remove his hands but did not comply. *Id.*

¶ 83     The district court found that, when the defendant refused to remove his hands from his pockets, the officer's action of grabbing him was reasonably related in scope to the circumstances that justified the interference in the first place. *Id.* at 101-02. The circuit court emphasized several facts to affirm the lower court's ruling and found that the officers had the requisite reasonable suspicion to stop the defendant. Notably, the neighborhood was a high-crime area with a known gang presence, there was a gathering of people in front of the building and in the lobby, and it was 4:25 a.m. *Id.* at 108. The court also highlighted that the defendant's noncompliance with the first order to stop, when viewed in light of the circumstances, reinforced the officers' determination that the defendant may have been engaged in criminal activity. *Id.* The court noted that seemingly innocent conduct may support a finding of reasonable suspicion if an indication of possible illicit activity exists. *Id.* The *Simmons* court indicated that the police are required to corroborate allegations of criminal activity in some meaningful way. *Id.* at 105. The basic requirement remains that an investigative stop must be predicated on reasonable suspicion that criminal activity is afoot. *Id.* (citing *Terry*, 392 U.S. at 30).

¶ 84     In the case at bar, the officers did not observe defendant in the location where the anonymous caller first indicated the alleged assault had occurred. Further, when the officers observed defendant at the second location several minutes later, there were no women in the vicinity. Not only did the officers not observe an assault or any evidence of an assault, but there was also no indication of possible criminal activity. Defendant was merely walking alone with his hand on his waistband. Unlike the suspect in *Simmons*, defendant immediately complied with the officers' request to approach their vehicle. Officer Luzadder's observations did not corroborate the information obtained from the anonymous 911 calls: there was no indication of illicit activity, past, present, or future, and defendant's actions did not reinforce a determination of reasonable suspicion of criminal activity. Accordingly, *Simmons* does not support the majority's position.

¶ 85                                    CONCLUSION

¶ 86        In my view, the analysis engaged in by the majority gives the police a license to use pretext as a justification to stop innocent people, where there is no observation of alleged criminal activity, thereby violating their constitutional rights. In addition, by failing to follow the reasoning of *Terry* and *J.L.*, the majority commits serious errors. First, under *Terry*, further investigation was required by the officers prior to this premature investigatory stop. Second, the majority incorrectly finds that the two anonymous 911 calls had indicia of reliability even though the two women, the assault, and the waving of a gun by defendant were not observed by the officers. Third, the majority distinguishes *J.L.*, erroneously finding that Officer Luzadder observed circumstances indicating the existence of an emergency. However, if a possible emergent situation existed, it had already dissipated when the officers arrived at the two locations, and there was no evidence presented that anyone was in danger, including the two officers. Fourth, the majority's reliance on *Simmons* is misplaced because its facts are distinguishable from the facts here. Furthermore, today's opinion inexplicably replaces the articulable two-part objective fact test in *Terry*, based on an officer's observations before the stop, with a subjective test based on an officer's recollection of the facts surrounding previous arrests. This court's deviation from the *Terry* precedent prevents me from joining the majority. Accordingly, for the above reasons, I respectfully dissent from the portion of the majority opinion that found reasonable suspicion for the *Terry* stop, and I would reverse the judgments of the appellate and circuit courts and vacate defendant's judgment of conviction and sentence.